# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00327-COA

**DANNY R. SIMS**                                                                                  **APPELLANT**

**v.**

**DANIEL SIMS AND MARY KATHLEEN SIMS**                                    **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/2019 |
| TRIAL JUDGE: | HON. CYNTHIA L. BREWER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ROBERT W. LAWRENCE |
| ATTORNEY FOR APPELLEES: | W. BENTON GREGG |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 08/24/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Appellees Daniel Sims (Daniel) and his wife, Mary, are the parents of four minor children.    Appellant Daniel R. Sims (Danny) is Daniel's father and the children's grandfather.[1]     After Daniel and Mary cut off all visitation between Danny and his grandchildren in October 2017, Danny filed a petition seeking to establish grandparent-visitation rights with his four grandchildren pursuant to Mississippi Code Annotated section 93-16-3(2) (Rev. 2013).    The Madison County Chancery Court denied

---

[1] The chancellor determined that Danny's wife, "Plaintiff[] Jonelle Sims, lack[ed] standing to claim grandparent visitation under the statute, as she is the step-grandparent to the four minor children."   The parties on appeal, as well as Jonelle's counsel, agree that Jonelle does not appeal the chancellor's ruling.   Accordingly, we will not consider her as an appellant.   *See Garner v. Garner*, 283 So. 3d 120, 141 (¶91) & n.11 (Miss. 2019).

Danny statutory grandparent-visitation rights because (1) Danny failed to establish the existence of a viable relationship with the two youngest grandchildren, *see* § 93-16-3(2)(a); and (2) although Danny had established a viable relationship with the two older grandchildren, he failed to prove that the children's parents had unreasonably denied him visitation. *Id.*

¶2.     Danny appeals, asserting the chancellor erred in making these determinations and in failing to undertake a *Martin*[2] children's-best-interests analysis before ruling on his petition for grandparent visitation. Danny also raises two assignments of error based upon pretrial matters. First, Danny asserts that the chancellor erred when she "failed to grant a temporary hearing" on his petition for temporary grandparent visitation prior to the trial on the merits. Second, Danny asserts that in ruling on Daniel and Mary's pretrial motion in limine seeking to exclude Danny's expert, Dr. Criss Lott, the chancellor erred when she sanctioned Danny by requiring him to pay the attorney's fees Daniel and Mary incurred in bringing their motion.

¶3.     For the reasons addressed below, we affirm the chancellor's judgment denying Danny's petition for grandparent visitation. In particular, we find no error in the chancellor's determination that a *Martin* children's-best-interests analysis was not required in this case

_____

[2] In *Martin*, the Mississippi Supreme Court set forth ten factors for the courts to use as a guideline in determining a child's best interests in the grandparent visitation context. *Martin v. Coop*, 693 So. 2d 912, 916 (Miss. 1997), *abrogated in part by Smith v. Martin*, 222 So. 3d 255, 263-64 (¶15) (Miss. 2017) (clarifying the requirement to consider whether visitation is in the best interest of the child).

because Danny failed to prove that he had established a "viable relationship" with the two youngest grandchildren and failed to prove that Daniel and Mary unreasonably withheld grandparent visitation with their four children. We further find that Danny's assignment of error concerning the chancellor's ruling on his petition for temporary grandparent visitation is both procedurally barred and moot. Lastly, we find no abuse of discretion in the chancellor's pretrial ruling awarding Daniel and Mary the attorney's fees they incurred in bringing their motion in limine to exclude Dr. Lott.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

¶4. As noted, Daniel and Mary are the parents of four minor children,[3] a girl, Hannah, born in 2012; a boy, Walter, born in 2013; and twin girls born in 2017. Daniel's father, Danny, is married to Jonelle. She is the children's step-grandmother. In February 2018, Danny and Jonelle filed a petition for grandparents' visitation under section 93-16-3(2). Daniel and Mary answered, denying the allegations in the petition other than Danny and Jonelle's acknowledgment that section 93-16-3(1) did not apply to their situation and therefore sought grandparents' visitation solely under section 93-16-3(2).

¶5. In April 2018, Danny and Jonelle filed a "Petition for Temporary Relief," seeking temporary visitation and contact with the children. Daniel and Mary opposed this petition. After a telephonic hearing, the chancellor summarily denied Danny and Jonelle's petition without setting forth the basis for the court's ruling. The record contains no transcript of the

_____

[3] Pseudonyms are used for the minor children where appropriate.

3

telephonic hearing.

¶6.    In June 2018, an agreed order was entered setting trial for January 31, 2019. Discovery ensued.  The parties exchanged written discovery beginning in June 2018, and depositions were noticed and taken in December 2018.  On November 29, 2018, Danny and Jonelle served a "Plaintiffs' Designation of Experts" that listed Dr. William Criss Lott as an expert witness.  The designation included the following statement:  "The expert is expected to testify to [the] psychological fitness of Danny R. Sims and Jonelle Sims[] for grandparent's visitation and any other opinion that the expert may acquire after hearing the testimony at trial."  Other than Dr. Lott's curriculum vitae (CV), no other information was provided.

¶7.    On January 22, 2019, Daniel and Mary moved to exclude Dr. Lott, asserting that such relief was warranted based upon the allegedly inadequate expert designation furnished by Danny and Jonelle.  Daniel and Mary also sought attorney's fees relating to this motion.  On January 24, 2019 (five business days before the original January 31, 2019 trial date), Danny and Jonelle served a report prepared by Dr. Lott.  They also filed their opposition to Daniel and Mary's motion to exclude Dr. Lott.

¶8.    After conducting a hearing on the matter, the chancellor did not exclude Dr. Lott from testifying.  Instead, the chancellor continued the trial date to August 5, 2019; ordered the parties to participate in mediation; and ordered Danny and Jonelle to pay the sum of $1,015, which was the attorney's fees that Daniel and Mary incurred in bringing their motion

4

(hereafter sometimes referred to as the attorney's fees sanction). Danny and Jonelle paid the $1,015 into the registry of the court as directed in the chancellor's order, and the parties participated in mediation. Mediation was unsuccessful.

¶9. Following the failed mediation, a one-day trial took place on August 5, 2019. Danny testified on his own behalf. The other witnesses called in Danny's case-in-chief were Jonelle; Joey Bullock, Danny's friend since elementary school; and Danny's pastor and neighbor, Darrel Blankenship. Mary, Daniel's wife and the grandchildren's mother, was also called as an adverse witness.

¶10. Danny and Jonelle testified about the "loving and close" relationship they both had with the two older grandchildren, Hannah and Walter, including having them stay at their home overnight; providing childcare when the parents took vacations or when the children were sick; hosting gatherings at Danny's vacation home at Eagle Lake; and attending or hosting other family gatherings. Danny acknowledged that there was a brief period beginning in the fall of 2013 when he and Jonelle were not allowed to visit with Hannah and that this coincided with Walter's birth. Danny and Jonelle were not present at his birth.[4] In January 2014, Danny and Jonelle resumed their relationship with Hannah and began a grandparent relationship with Walter.

---

[4] According to the testimonies of Danny, Jonelle, and Daniel, the relationship between the two families was broken off in 2013 due to a dispute between Danny and Daniel over a rental property and also because Danny told Daniel he was going to stop paying for Daniel's cell phone.

¶11. During this time period, Danny testified that Daniel expressed a "big interest" in real estate, so he helped him get started with a rental business. Danny said, "I was a big part in helping [Daniel] get going, of loaning him money, doing bridge loans until he could secure financing and things like that. And I'm very proud of him on that because he took it and he ran with it, and he did good."

¶12. The twins were born in July 2017. Danny testified that he and Jonelle were at the hospital during their birth and visited numerous times at the hospital. They had a grandparent relationship with all four children until October 1, 2017, when Danny and Daniel argued. The dispute arose over changes to the plans of a home the parties agreed to build together for Daniel, Mary, and their four children. Danny testified that he provided land on his property in Crystal Springs, Mississippi, for Daniel's new home. Danny and Jonelle also financed the home construction and agreed that Daniel and Mary would pay Danny and Jonelle from the proceeds of the sale of their Madison home. Daniel and Mary purchased house plans, and construction began in the summer of 2017.

¶13. Danny testified that on October 1, 2017, Daniel and the older two children came to Crystal Springs for Daniel to see the progress on the new construction. The house was framed and roofed, with roughed-in plumbing. Daniel requested that a window be placed in the master shower. Danny refused. According to Danny, this was a disagreement about business. Danny said due to Daniel's "disrespect" during that argument, he told Daniel that he could no longer use his (Danny's) offices, and if he tried to tear out the wall himself to

6

install the window, he would have Daniel arrested. Danny testified that because of this argument, Daniel sent a text to him the next day that said Danny "would never see [Daniel's] children again." Danny also testified that although he has tried to do so, he has not seen his grandchildren, Daniel, or Mary, since October 1, 2017. He said he would like to renew his relationship with all of them. Jonelle testified that she was allowed to see the grandchildren for a couple of months after the October 2017 incident, but in December 2017 she too was not allowed visitation.

¶14.    Joey Bullock testified that he has known Danny for over fifty years and has known both Daniel and his older brother, Stephen, since they were boys. Over the years he has been to holiday gatherings and gatherings at Eagle Lake with Danny and Jonelle and Daniel, Mary, and the children. He testified that from what he has seen when Danny was with his grandchildren, "[t]hey got along well. Very good, very normal. They interacted well." From his observations, he also believed Danny and Daniel had a "normal" relationship. He testified that Danny was of "solid" character.

¶15.    Reverend Darrel Blankenship testified that he has known Danny and Jonelle for about nine years and that they were both people "of integrity."

¶16.    Mary Sims was called as an adverse witness. When questioned by Danny's counsel, she acknowledged that she had testified in her deposition that before October 2017 her children had a "good relationship" with Danny and Jonelle and that Danny and Jonelle always took good care of the children when they were with them.

7

¶17. When asked about the decision to sever ties with Danny on October 1, 2017, Mary acknowledged that it was Daniel's decision, but she also "trusted his decision. It was a decision made on a lot of past experiences of volatile outbursts. I've been around fifteen of my thirty years, and I've seen a lot of what, in my opinion, we call verbal, emotional abuse. So that decision I understood. I understood him." Mary was then asked, "[P]rior to October 1, 2017, you saw no reason to sever that relationship?" Mary responded, "Not until we saw the vindictiveness of his father coming back out with warning signs of who he really was."

¶18. The plaintiffs rested their case.

¶19. Daniel and Mary presented their case. Daniel and his older brother, Stephen, testified for the defense. Daniel began his testimony by explaining that his objection to grandparent visitation was rooted in his father's abusive and controlling behavior spanning from his childhood until the present. Daniel testified that at the time of trial he was thirty-years old and that throughout Daniel's life, his father's temper would be more "properly [described] as rage[;] [he] . . . screams, yells, [his] face turns blood red." Continuing, Daniel testified that it is "[a] frightening rage and total loss of control to the point of [Danny's] face turning red and blood vessels popping up on the top of his head and neck."

¶20. Daniel described some of the incidents that happened over the years, including, for example, a time when Daniel was a little boy and he saw his father pin his mother against a chair and scream violently in her face. He then described a more recent incident between Danny and Jonelle when, according to Daniel, Danny grabbed Jonelle by the ankles during

8

an argument and dragged her down the stairs. Daniel said that Danny then justified his actions, saying, "I told her to stop."

¶21.   Other incidents included a time Daniel broke his arm as a teenager; and his father chided him for foolishly wrestling with other boys and screamed at him for the inconvenience of recurring medical appointments. Another time that Daniel described was when he was about twelve years old, and Danny "lit into" him for waiting until the day of Danny's birthday to get him a birthday card. Daniel testified that Danny had a similar reaction when Daniel and Mary had just had their firstborn and they failed to buy Danny a birthday gift in 2012. As additional examples, Daniel testified about incidents that happened when he was in high school or college, including a time when his father repeatedly threw Daniel's cell phone in a fit of "total outrage" until the phone shattered, as well as another incident when Danny lost control and screamed uncontrollably about a crack in the car windshield.

¶22.   Daniel also testified that he wet the bed nearly every night until his early teens. He told of the ways his father humiliated him about his bedwetting, even threatening to display Daniel's soiled mattress in their front yard as way to get him to stop what was an uncontrollable bodily function. Daniel testified that his father's actions in this regard were especially concerning to him because his son Walter (age four at the time of trial) still wet the bed, and Danny told Daniel and Mary that Walter better not wet the new mattress that Danny purchased for his Eagle Lake home.

¶23.   After recounting these incidents and others like them, Daniel testified that although

9

these incidents occurred in the past, they are important now regarding his children because "this . . . same person . . . exists today," and "considering that he [(Danny)] has a . . . history, in my opinion, of being verbally, emotionally abusive, [this] . . . would not be a good environment" for my children. Daniel testified that his father used whatever means necessary to force others to comply with his will, including humiliation, degradation, rage, fear, and manipulation. Daniel also testified about how his father used financial support to control Daniel. Additionally, Daniel described how Danny turned Daniel against his brother, Stephen, and alienated him from his paternal grandmother and aunt and uncles.

¶24. Regarding the 2013 grandparents' visitation withdrawal, Daniel testified that in the fall of 2013, he and his father had a disagreement over a rental property. Daniel withdrew from his father at that time due to his father's controlling behaviors such as Danny's cutting off Daniel's cell phone that Danny paid for at that time. The first withdrawal of visitation resulted in Danny and Jonelle not being present for the birth of Daniel and Mary's second child, Walter.

¶25. As noted, Danny and Jonelle were allowed to see Hannah again in January 2014, and they also began a relationship with Walter. At this time, Daniel's and Danny's businesses were intertwined, and Daniel testified that Danny began to become controlling again. Daniel also testified that Danny was "very negative" and very "vocal" about Daniel and Mary having more children when they told Danny and Jonelle that they were expecting twin girls. Daniel testified, "I felt like the person that we thought [my father] was when we reengaged him and

Jonelle with the kids . . . was no longer the case, that he was the same individual that we had withdrawn from in Walter's birth and had all the characteristics that [I] had grown up with."

¶26.   Daniel also testified about an incident between Danny and Walter when Walter was three years old.  Danny had taken an apple that Walter was eating and was teasing him with it.  When the child got frustrated, Danny swatted the child on his leg, causing the child to scream.  Daniel said, "I saw myself sitting in that little boy, because growing up, . . . [neither] my brother nor myself ever had a voice . . . because we were always intimidated, belittled, controlled [by our father]."  Daniel then testified, "I speak for my son to this Court today to defend that that will never happen to him.  He has a voice, and he has it through his dad."

¶27.   Soon after that incident, a second withdrawal of the grandchildren and the final breakdown of Daniel and Danny's relationship occurred during the summer of 2017.  Daniel testified that he and his father had a disagreement over changing the house plans to have a window installed in the master bathroom.  According to Daniel, Danny had originally agreed to fund the building of a house, but after the argument, he changed the arrangement by demanding repayment from Daniel and Mary upon the sale of their current residence.  Daniel testified that his father also told him that he could no longer use Danny's office for renters to drop off their rent-payment checks, which resulted in Daniel having to repeatedly make the forty-five minute drive between Crystal Springs and Madison, Mississippi, to pick up rent payments as they came due and were paid.

¶28.   Daniel was asked whether there was any truth to his father's testimony that Daniel and

11

Mary severed the relationship between Danny and the children due solely to the 2017 "business disagreement" over the bathroom window construction. Daniel testified, "Absolutely not." He said that he did not withhold visitation because of the disagreement over the house; rather, it was Danny's behavior over decades that caused Daniel and Mary to decide enough was enough. Daniel and Mary made the decision to sever the relationship due to Danny's history of verbal and emotional abuse and warning signs that his true nature was returning. Daniel testified that he believed the verbal, emotional, and physical abuse Danny inflicted upon him and others would be repeated with his children.

¶29.	Daniel's brother, Stephen, testified about other incidents that corroborated Daniel's descriptions of their father's behavior, including a time when his father pushed him up against a wall as a teen, grabbed his shirt at his throat, and raged in his face—all because he was wrestling with some other boys on his birthday. Stephen further testified to an incident when Danny was yelling and berating Daniel and began pushing him in the chest with both hands. Additionally, Stephen verified the incident when Danny pulled Jonelle down the stairs by her ankles.

¶30.	When asked about his father's relationship with his two young children, Stephen testified that although he allows his children to visit with Danny, he has a level of concern with visitation that depends on his relationship with his father.

¶31.	After the defense rested, Danny testified in rebuttal and also called his expert witness, Dr. Lott, who prepared a psychological evaluation of Danny.

¶32. Danny testified that most of the incidents between him and Daniel during Daniel's high school and college years were primarily disciplinary (i.e., the incidents related to Daniel's steroid and alcohol abuse, missing college classes, and overdrafts on Daniel's checking account); the incidents happened because he was trying to teach Daniel responsibility. He testified that he and Daniel had a "very good relationship" after they reconciled in 2013.

¶33. When asked about the incident with Jonelle, Danny testified that the boys (Daniel and Stephen) were not even there to see it. Later during cross-examination, however, Danny was asked why he would have told the boys about the incident if they were not there. Danny responded, "I don't know. I guess they heard it. I'm not sure." Danny described the incident with Jonelle as a dispute that happened about "fourteen, fifteen years ago"; he could not remember what the dispute was about. He said, "Jonelle was [sitting] at the edge of the staircase . . . and I just did not want to argue . . . anymore. . . . And I asked her to stop, and she didn't, and I pulled her down two or three steps. But it was not anything like what Daniel describes." Elaborating, Danny said, "[S]he was not injured. No law was called. Nobody was bruised. No one was hurt. Nothing violent happened. I mean, I did pull her down a few steps, and I've admitted to that. But there was nothing more to that."[5]

---

[5] During her testimony, Jonelle was also asked about this incident. She testified that neither Daniel nor Stephen saw what happened. She said she and Danny were arguing over some forgotten issue. Danny was upstairs, and she was sitting on the top step of the staircase. Jonelle said that Danny told her that he did not want to talk about it anymore, and after she kept talking about it, "he came and walked around me and pulled me down maybe

13

¶34.    The chancellor found Dr. Lott qualified to testify as an expert in the field of clinical and forensic psychology, and his report was admitted into evidence at trial.  Dr. Lott stated that his testimony and report were limited to an evaluation of Danny's current mental status or mental well-being.[6]  He explained that because he had not performed a court-ordered evaluation, he was required to obtain Daniel and Mary's consent for him to evaluate them and to observe Danny with the children.  They did not give their consent.

¶35.    Regarding Danny, Dr. Lott ultimately concluded in his report:

> Based on the data available to me, it is my opinion that [Danny] has a history of emotional outbursts with his family, but there is no data to indicate that he has exhibited any explosive or inappropriate behavior toward any grandchildren, and he presents as a well-adjusted individual who is capable of providing appropriate care to all of his children and grandchildren.

¶36.    At trial, Dr. Lott elaborated on his findings.  He testified, "In my report, I noted, after talking with folks, that it appeared to me that [Danny] had a history of some emotional outbursts, maybe some emotional volatility that was in the past."  He further testified that the trial testimonies and depositions of Daniel and Stephen "corroborated what was [his] perception," and he acknowledged that there is "a history of some conflict" in the family.  Dr. Lott then testified, "[B]ut those are patterns of behavior that happened inside the home

---

two or three steps.  And it was not abusive.  It wasn't a domestic scene.  It was just getting me out of the room.  [There] was not anything violent about it."

[6] In preparing his report, Dr. Lott administered several personality tests to Danny and interviewed Jonelle, Stephen, a number of Danny's friends, and Reverend Blankenship.  He also reviewed a number of pleadings, discovery taken in the case, and the parties' depositions.  Additionally, Dr. Lott attended the one-day trial and heard the testimonies of the parties and the other witnesses.

years ago." Regarding Danny's ability to be a grandparent to the children, Dr. Lott testified, "I [did not] see that [Danny] had any flags that would cause concern for someone if they were making . . . a co-parenting or a co-grandparenting kind of arrangement or process."

¶37. When asked, "[W]hat is your opinion of Danny's fitness as a grandparent?" Dr. Lott responded, "In my opinion, he has the capacity to nurture and to provide appropriate care for these grandchildren." Dr. Lott said that based upon his interview with Stephen and the testimonies he heard during trial, "Stephen's children had been visiting with [Danny]. Daniel's children had been visiting with [Danny]. There is a history here of conflict between father and son, and maybe both sons. . . . That's between them." Regarding the grandchildren, Dr. Lott testified, "I did not hear the conflict with the children—with the grandchildren . . . . I have no data to indicate that [Danny] has exhibited any explosive or inappropriate behavior toward any grandchildren."

¶38. The plaintiffs finally rested, and the chancellor ordered the parties to provide proposed findings of fact and conclusions of law.

¶39. After considering the testimony and evidence presented at trial and the proposed findings of fact and conclusions of law submitted by the parties, the chancellor issued her opinion on October 21, 2019. The chancellor denied the plaintiffs' "Petition to Establish Grandparents' Visitation Rights" in its entirety. As noted, the petition was denied as to Jonelle because, as a step-grandmother, she lacked standing under section 93-16-3 to seek grandparent visitation. As to Danny, the chancellor found that Danny did not prove the

existence of a "viable relationship" with the younger two children (the twin girls), as required by the first part of section 93-16-3(2)(a). Regarding Hannah and Walter, the chancellor found that although Danny had proved that a "viable relationship" existed with them, Danny failed to prove that Daniel and Mary unreasonably denied him visitation, as the second part of section 93-16-3(2)(a) requires. The chancellor found that a *Martin* children's-best-interests analysis was not required under these circumstances and denied Danny's request for grandparent visitation in toto. The chancellor also ordered that the parties "shall bear their own costs associated with litigating this matter."

¶40. Danny filed a "Motion for Amendment of Judgment and Rehearing," seeking a new trial or an amendment to the chancellor's judgment regarding the chancellor's determination that Daniel and Mary did not unreasonably deny Danny visitation with Hannah and Walter. In the same motion, Danny requested a refund of the $1,015 (the pretrial attorney's fees sanction) that Danny deposited with the chancery clerk pursuant to the chancellor's August 5, 2019 order. The chancellor denied Danny's post-trial motion and specifically ordered that the $1,015 held by the chancery clerk be released to Daniel and Mary.

¶41. Danny appeals.

## STANDARD OF REVIEW

¶42. "Findings of a chancellor will not be disturbed on review unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard." *Smith v. Martin*, 222 So. 3d 255, 259 (¶4) (Miss. 2017) (internal quotation marks omitted). We review issues

16

of law de novo. *Vermillion v. Perkett*, 281 So. 3d 925, 929 (¶9) (Miss. Ct. App. 2019). "We recognize the chancellor possesses sole discretion as to whether sanctions should be imposed for discovery violations, and we employ an abuse-of-discretion standard of review when considering a chancellor's order of sanctions." *Williamson v. Williamson*, 81 So. 3d 262, 276 (¶31) (Miss. Ct. App. 2012).

## DISCUSSION

### I. Grandparent Visitation Pursuant to Section 93-16-3(2)

#### A. Applicable Law

¶43. Two of Danny's four assignments of error concern the chancellor's determination that Danny was not entitled to grandparent visitation pursuant to section 93-16-3(2). We begin by setting forth the statutory provisions applicable to these two assignments of error.

¶44. "There is no common-law right to grandparent visitation. The right is purely statutory and may only be considered if the statutory criteria are met." *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013) (citation omitted). Danny seeks visitation pursuant to section 93-16-3(2), which provides:

> (2) Any grandparent . . . may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:
>
> > (a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and
> >
> > (b) That visitation rights of the grandparent with the child would

17

be in the best interests of the child.

> (3) For purposes of subsection (2) of this section, the term "viable relationship" means a relationship in which the grandparents or either of them have voluntarily and in good faith supported the child financially in whole or in part for a period of not less than six (6) months before filing any petition for visitation rights with the child, [or] the grandparents have had frequent visitation including occasional overnight visitation with said child for a period of not less than one (1) year . . . .[7]

Miss. Code Ann. § 93-16-3(2)–(3).

### B.      Viable Relationship with the Twin Girls

¶45.    Danny asserts that the chancellor erred when she denied grandparent visitation with respect to the twin girls based on her determination that he failed to establish a "viable relationship" with them.  He asserts that the chancellor should have interpreted section 93-16-3(2) as providing that grandparent visitation may be allowed as to "*all* grandchildren if it is in their best interest [under the *Martin* factors] and if a viable relationship has been found *with any of the grandchildren*."  (Emphasis added).  Danny contends that such an interpretation would eliminate the "onerous result of a split family [if the] [g]randparents

---

[7] Additionally, section 93-16-5 provides:

> All persons required to be made parties in child custody proceedings or proceedings for the termination of parental rights shall be made parties to any proceeding in which a grandparent of a minor child or children seeks to obtain visitation rights with such minor child or children; and the court may, in its discretion, if it finds that such visitation rights would be in the best interest of the child, grant to a grandparent reasonable visitation rights with the child.

Miss. Code Ann. § 93-16-5 (Rev. 2013).

could visit the oldest two grandchildren but not the youngest two grandchildren." We find no merit in Danny's assertions as addressed below.

¶46. We find our decisions in *Aydelott v. Quartaro* and *Greer v. Akers*, No. 2019-CA-00745-COA, 2021 WL 248051 (Miss. Ct. App. Jan. 26, 2021), *cert. denied* (Miss. Aug. 3, 2021), particularly helpful in our analysis. In *Aydelott*, 124 So. 3d at 99 (¶3), the Quartaros sought grandparents' visitation with their two granddaughters, ages five and two at the time of the grandparents' visitation hearing. Addressing the "viable relationship" factor under section 93-16-3(2) and (3), this Court stated, "For the Quartaros to have the statutory right to petition for visitation, they *first* had to show they 'had established a viable relationship' *with each granddaughter*." *Id.* at 100 (¶10) (emphasis added) (quoting Miss. Code Ann. § 93-16-3(2)(a)).

¶47. The Court recognized that "[g]randparent visitation is different than child custody, as there are other evidentiary considerations besides the child's best interest that must be considered—namely, whether the grandparent has produced sufficient evidence to show he or she is authorized under the statute to be awarded visitation." *Id.* at 103 (¶19).

¶48. Continuing, the Court explained, "Only by the Quartaros' establishment of a viable relationship and unreasonable denial of visitation" could they "reach the polestar consideration for statutory grandparent visitation—whether 'visitation rights of the grandparent with the child would be in the best interests of the child.'" *Id.* at 101 (¶11) (other internal quotation marks omitted) (quoting Miss. Code Ann. § 93-16-3(2)(b)); *see also*

*Vermillion*, 281 So. 3d at 933 (¶23) ("[Because] the record reflects that [the grandmother] failed to meet her burden of proving that she had established a viable relationship with [the grandchild], we find that the chancellor was not required to consider [the child's best interests] before granting the motion for directed verdict."); *Hillman v. Vance*, 910 So. 2d 43, 47 (¶11) (Miss. Ct. App. 2005) (recognizing that because the chancellor found that the grandparent seeking visitation failed to meet one of the requirements of section 93-16-3(2), the chancellor could have terminated his analysis at this point and denied visitation without conducting a *Martin* children's-best-interests analysis).

¶49.    Similarly, in *Greer*, 2021 WL 248051, at *2 (¶11), Sandra Aker sought grandparent visitation with her three granddaughters.  Recognizing that "[a] grandparent must establish a viable relationship with *each grandchild at issue*," *id.* at *3 (¶13) (emphasis added) (citing *Aydelott*, 124 So. 3d at 100, 102 (¶¶10, 15)), we affirmed the chancellor's award of visitation with the two older granddaughters, but this Court found that "Sandra failed as a matter of law to establish a viable relationship with Collins [(the youngest child)]."  *Id.* at *8 (¶32). "Therefore," this Court held, "Sandra failed to satisfy the requirements of the grandparent visitation statute with respect to Collins, and a court has no authority to award a grandparent visitation outside the statute.  Accordingly, we reverse and render the judgment to the extent that it awards Sandra visitation with Collins."  *Id.*

¶50.    We find no basis for applying a different analysis from *Aydelott* or *Greer* in this case. Danny's assertions to the contrary are without merit under a plain reading of section 93-16-3

20

and as established by the case precedent discussed above. The right to grandparent visitation is "purely statutory" and may be allowed "only . . . if the statutory criteria are met." *Aydelott*, 124 So. 3d at 100 (¶9). In short, "[n]either the chancellor nor this Court has the authority to rewrite the grandparent visitation statute or carve out exceptions to the mandatory requirements of the statute." *Greer*, 2021 WL 248051, at *4 (¶19) (citing *Garner*, 283 So. 3d at 141 (¶90)). Danny failed as a matter of law to meet the first statutory requirement—the existence of a "viable relationship"— with respect to the twin girls. The chancellor was not required to undertake a *Martin* children's-best-interests analysis under these circumstances. Accordingly, we reject this assignment of error.

### C.     Visitation Unreasonably Denied by Parents

¶51.    Danny asserts that the chancellor erred in determining that he failed to prove Daniel and Mary unreasonably withheld his visitation rights with the children after October 1, 2017. Intertwined with this argument is Danny's assertion that the chancellor erred by failing to consider the *Martin* factors and the children's best interests before denying his request for grandparent visitation.

¶52.    In addressing this assignment of error, we are guided by the principle that "[t]he determination whether parents are unreasonable in denying visitation in whole or part to grandparents is not a contest between equals. Parents with custody have a paramount right to control the environment, physical, social and emotional, to which their children are exposed." *Stacy v. Ross*, 798 So. 2d 1275, 1280 (¶23) (Miss. 2001). Based upon our

21

deferential review and the applicable law, we find that the chancellor did not err in finding that Danny failed to prove Daniel and Mary unreasonably denied him visitation with the children, and therefore the court was not required to consider the *Martin* factors before concluding Danny was not entitled to grandparent visitation.

¶53.    Danny asserts that his own testimony, as well as the testimonies of Mary, Jonelle, Dr. Lott, Reverend Blankenship, and Joey Bullock, constitute "overwhelming[] pro[of] that Danny and Jonelle were good, loving grandparents, and enjoyed a normal relationship until Daniel broke off all contact on October 1, 2017." According to Danny, after the October 1, 2017 construction-detail dispute between Danny and Daniel, "Daniel retaliated and told Danny he would never see his grandchildren again."

¶54.    Danny contends that the chancellor failed to properly take into account this "retaliation" on Daniel's part and "ignored the real world past and present relationship between Danny and the grandchildren." Elaborating, Danny asserts that "[c]hildhood issues between Danny and Daniel relative to Daniel's steroid abuse, alcohol abuse, missing college classes, and spending money he did not have, are not reasonable grounds to justify termination of grandparents['] rights without considering the *Martin* factors." Danny argues that the circumstances in this case are akin to those in cases in which the courts find that a grandparent met the "unreasonably withheld visitation" requirement when visitation was withheld based upon "unfounded" beliefs, *Lofton v. Lofton*, 176 So. 3d 1184, 1187 (¶12)

22

(Miss. Ct. App. 2015);[8] or on grounds that were not supported by the evidence presented. *See Martin*, 222 So. 3d at 258 (¶2) (affirming the chancellor's grant of grandparent visitation where, among other factors, the chancellor found that visitation was unreasonably withheld when "[a]lthough the [children's parents] testified that they denied visitation for behavior-related reasons, the chancellor found no causal connection between the children's behavior and their visits with the [grandparents]").[9]

¶55.    We find that these cases are distinguishable and that Danny's contentions are contrary to the record and the chancellor's detailed opinion. The chancellor devoted eight pages of her opinion to her findings supporting her determination that Danny did not prove Daniel and Mary unreasonably withheld visitation. Three of these pages addressed the "retaliation" aspect of the chancellor's analysis.

¶56.    The chancellor began this discussion by stating the crux of the issue:

> Danny testified that Daniel and Mary unreasonably denied visitation beginning October 1, 2017, after Danny and Daniel had an argument. Danny blames Daniel and their October 1 argument as the sole reason he no longer has visitation with his grandchildren. He testified that they had no problems and

---

[8] In *Lofton*, this Court found that the parents unreasonably denied visitation to the grandparent where visitation was denied on the unsubstantiated belief that the grandparent had reported the child's father to the Mississippi Department of Human Services. *Id.* at 1187 (¶12).

[9] Danny also cites *T.T.W. v. C.C.*, 839 So. 2d 501 (Miss. 2003), in support of his assertions. In *T.T.W.*, the supreme court found that a grandmother was entitled to visitation where, despite her attempts, she had not seen her grandchild for three years but had established a viable relationship prior to her visitation being terminated. *Id.* at 506 (¶15). The supreme court, however, did not address the evidence relating to whether the grandmother had established that visitation was unreasonably withheld. *Id.*

23

no prior conflict. However, Daniel disputes this, and testified at length as to his reasoning and basis for severing the grandparent visitation.

In addressing this issue, the chancellor delineated the evidence and testimonies about "the series of incidents dating back to Daniel's childhood and continuing after [the October 1, 2017] argument." The chancellor also explained how these incidents, though occurring in the past, were relevant to the issues before her.

¶57. For example, regarding the testimonies from Daniel, Stephen, Danny, and Jonelle about the altercation between Danny and Jonelle, the chancellor found that it was relevant "not just because of the physical conflict but also because of Danny's reaction, both at the time of the altercation and during the testimony at trial." The chancellor described Danny's demeanor on the witness stand as "dismissive," and she noted that Danny changed his testimony about the altercation in the course of his testimony—first claiming that Stephen and Daniel "were not there" at the time, and later admitting, "I guess they heard [the altercation]. I'm not sure." In light of these observations about Danny's testimony, the chancellor found "that Stephen's testimony, which comports with Daniel's testimony, is credible in these facts and circumstances. Stephen and Daniel both testified that Danny used physical force against not only Jonelle, but against Daniel and Stephen."

¶58. The chancellor also noted Daniel's testimony "that Danny used physical force against Daniel's mother, and that Danny slapped [Walter] on the leg." The chancellor observed that "Danny dismissed Daniel's concerns [about the incident], both at the time the incident occurred and at the trial." The chancellor found it relevant that "[w]hile Danny testified that

he would accept the way that Daniel chooses to raise the children, he rejected the concerns that Daniel raised, and never apologized."

¶59. Another incident the chancellor described in her opinion was "Daniel's concern that Danny would dismiss the parents' choice not to discipline [Walter] for occasionally wetting the bed." The chancellor noted Daniel's testimony "that Danny used humiliation and threats of humiliation against Daniel when Daniel wet the bed as a young boy [and] Daniel and Mary have purposely avoided using humiliation or threats in their approach with [Walter]." Continuing, the chancellor observed that "Daniel became concerned about Danny employing the same tactic with [Walter], when Danny told Daniel that [Walter] 'better not wet the bed' at the Eagle Lake house, as the mattresses were brand new."

¶60. After reviewing these incidents and others, the chancellor then set forth her findings with respect to Daniel's concerns "that Danny will refuse to refrain from speaking negatively about Daniel to his children, even if court-ordered to do so," and "that Danny will attempt to influence the children against their parents, as Danny has alienated and manipulated family members in the past." The chancellor found that "these concerns are valid, given the testimony [from both Daniel and Stephen] and the [other evidence] presented," and they were important "when considering whether the parents unreasonably denied visitation."

¶61. Regarding Dr. Lott's report and testimony, the chancellor recognized that Dr. Lott "acknowledged in his testimony that Danny has a history of conflict and inappropriate behaviors that occurred inside the home. However, he emphasized that the conflict is

between Danny and Daniel and he had 'no data to indicate that he has exhibited any explosive or inappropriate behavior toward any grandchildren.'" In this regard, the chancellor recognized that "Dr. Lott included in his report that Danny is 'capable of providing appropriate care of . . . grandchildren.'" The chancellor also recognized that "Mary admitted in her testimony that Danny and Jonelle provided adequate care to her children. Further, Stephen testified that his two children . . . are well cared for while visiting Danny and Jonelle, and that he has allowed his children to spend overnight visitation with Danny."

¶62. The chancellor, however, also noted Dr. Lott's testimony about his "limited role in these proceedings" because he was not court-appointed. He testified that without consent from Daniel and Mary (which he was unable to obtain) "he [was] not be able to observe the grandchildren . . . or express opinions about Daniel and Mary." As such, the chancellor noted that Dr. Lott "expressed frustration that he did not have access to the individuals he needed to evaluate and observe the most." The chancellor ultimately concluded, "The Court takes into consideration Dr. Lott's report and his testimony, in light of his limited role in the proceedings, and finds that Dr. Lott was unable to state an opinion as to whether the parents unreasonably denied visitation with the grandchildren."

¶63. In continuing her assessment of whether Daniel and Mary unreasonably denied Danny grandparent visitation, the chancellor found that "Danny and Daniel remain in a state of unresolved conflict," but the chancellor also found that "Daniel has made attempts to include

26

Danny in the children's lives despite their differences." In this regard, the chancellor found that "Daniel allowed Danny's grandparent relationship to resume in 2013[;] . . . Daniel testified that he resumed the relationship in 2013 because he wanted to give his father another chance."

¶64. Addressing the circumstances surrounding Daniel and Mary's decision to sever the grandparent relationship after the October 2017 argument, the chancellor found:

> Despite Daniel's attempts to maintain family harmony, he found it impossible after the October 2017 argument. Mary agreed and supported Daniel's decision to sever the grandparent ties based upon "past experiences [of] volatile outbursts" and that she has "been around [Danny] fifteen of her thirty years and seen a lot of verbal, emotional abuse" by Danny. Further, she testified that she saw Danny's vindictiveness after the October 1st argument . . . . As a result of what Daniel found to be a continuing pattern exhibited by his father, Daniel and Mary excluded Danny from the lives of his children.

¶65. The chancellor also considered whether Daniel and Mary denied grandparent visitation "out of spite," taking into account Danny's reaction to the October 1 argument (cutting off all financial and business ties with Daniel and retracting his agreement to provide the land and financing for Daniel's home construction) and Daniel's final text to his father (that Danny would "never see the kids again"). The chancellor concluded that although "the appellate courts have cautioned against denying grandparent visitation solely based on tensions between adult family members or out of spite, the Court finds this case distinguishable from the facts presented in the present case law." The chancellor found:

> Danny chooses to believe that Daniel and Mary withheld visitation over one argument on October 1, 2017. However, the Court finds that Daniel and Mary

27

severed the relationship not solely to retaliate after the argument, but also on legitimate concerns of future conflict and inappropriate behavior in the presence of the children and also that Danny would disregard and override the parents' disciplinary decisions whenever the decisions conflict with what Danny believes should be done. Even as of his testimony at trial, Danny takes no responsibility for his role in the state of his father-son relationship or for the reasons for the breakdown in his relationship with his grandchildren. He blames Daniel entirely.

Daniel repeated his position and reasoning to the Court multiple times. He exhibited emotional pain while testifying about his relationship with his father and his concerns that his father is repeating a pattern of inappropriate behavior with [Walter]. Daniel testified that he saw himself in [Walter] when he witnessed Danny slap [Walter] on the leg. He testified that he never had a voice to protect him against his father in his childhood, but that he felt he was able to be a voice for his son and made the decision to protect [Walter]. It does not appear that he made this decision rashly, but rather came to the decision after years of what Daniel found to be inappropriate conduct on Danny's part. While both Danny and Daniel have engaged in spiteful behavior, the Court finds Daniel's testimony to be credible and supported by corroborating witnesses. In reviewing the facts and evidence, and in observing the demeanor of all witnesses at trial, the Court finds that Danny has not met his burden of proof for this Court to find that the parents unreasonably denied visitation. His requested relief is denied.

¶66. Applying our deferential standard of review, we find no error in the chancellor's determination that Danny failed to prove that Daniel and Mary unreasonably denied grandparent visitation in this case. *See Patrick v. Boyd*, 198 So. 3d 436, 443 (¶25) (Miss. Ct. App. 2016) ("[T]o the extent that the chancellor's finding turns on conflicting testimony and the credibility of the witnesses, we are without authority to second-guess her ruling because the chancellor alone has the authority to decide what the disputed testimony shows." (internal quotation marks omitted)).

D.      **Best Interests of the Children**

28

¶67. Despite the chancellor's determinations that he failed to prove he established a "viable relationship" with the twin girls and that he failed to prove that Daniel and Mary "unreasonably withheld" grandparent visitation with their children, Danny maintains that the chancellor erred in failing to consider the best interests of the children in this case. This assertion is without merit and is contrary to the plain language of section 93-16-3 and controlling caselaw establishing that only where a court first finds "a viable relationship and unreasonable denial of visitation" does the court consider whether "visitation rights of the grandparent with the child would be in the best interests of the child" under section 93-16-3(2)(b). *Eaves v. Gatling*, 194 So. 3d 171, 174 (¶8) (Miss. Ct. App. 2015); *see Vermillion*, 281 So. 3d at 932 (¶21); *Aydelott*, 124 So. 3d at 101 (¶11); *Hillman*, 910 So. 2d at 47 (¶11).

¶68. As we have addressed above, we find no error in the chancellor's determination that Danny failed to establish a "viable relationship" with the youngest two grandchildren (the twin girls). Nor do we find that the chancellor erred in determining that Daniel and Mary did not unreasonably withhold grandparent visitation with their children. Accordingly, we find no error in the chancellor's determination that she was not required to consider the best interests of the children.

## II.    Temporary Order on Grandparent Visitation

¶69. Two months after filing their petition for grandparents' visitation rights, Danny and Jonelle filed a "Petition for Temporary Relief" in which they sought temporary visitation

with the children. Daniel and Mary opposed this petition, and the chancellor held a telephonic hearing on the petition. On June 18, 2018, the chancellor entered an order denying Danny and Jonelle's petition that provided, in full, "THIS COURT, after telephonic hearing and being fully advised in the premises, HEREBY DENIES the Plaintiffs' Petition for Temporary Relief."

¶70. On appeal, Danny asserts that the "[chancery] court erred as a matter of law in ruling it did not have jurisdiction to grant a temporary hearing." Danny also asserts that the request for temporary visitation "was denied by the court without considering the best interest of the grandchildren." However, the chancellor's order does not indicate why she denied the petition, nor does record contain a transcript of the referenced telephonic hearing. We find that this assignment of error is procedurally barred because Danny has wholly failed to provide a sufficient record for this Court's review. *See Oakwood Homes Corp. v. Randall*, 824 So. 2d 1292, 1293 (¶4) (Miss. 2002) (recognizing that "[t]he appellant has the duty of [e]nsuring that the record contains sufficient evidence to support his assignments of error on appeal" (internal quotation mark omitted)); *Jones v. State*, 799 So. 2d 171, 174 (¶13) (Miss. Ct. App. 2001) ("It is elementary that a party seeking reversal of the judgment of a trial court must present this court with a record adequate to show that an error of reversible proportions has been committed and that the point has been procedurally preserved." (internal quotation marks omitted)). Danny has waived this issue on appeal.

¶71. In any event, this issue is moot because we find no error in the chancellor's denying

30

Danny's petition for grandparent visitation in toto. *See Frisby v. City of Gulfport (In re City of Biloxi)*, 113 So. 3d 565, 572 (¶20) (Miss. 2013); *Roley v. Roley*, No. 2019-CP-01863-COA, 2021 WL 1974064, at \*16 (¶68) (Miss. Ct. App. May 18, 2021) ("When a matter proceeds to a final judgment, as in this case, questions regarding temporary custody are moot[,] and we do not consider them."), *mot. for reh'g pending*.

### III.    Attorney's Fees as a Sanction Relating to Dr. Lott's Expert Designation

¶72.    Danny asserts that the chancellor erred in directing him to pay Daniel and Mary's attorney's fees as a sanction for, in Danny's words, "the manner in which [he] presented [his] disclosure of Dr. Lott[] and Dr. Lott's report." "Only in cases of abuse of discretion will we reverse a trial court's ruling on discovery matters." *Palmer v. Volkswagen of Am. Inc.*, 904 So. 2d 1077, 1090 (¶54) (Miss. 2005). For the reasons addressed below, we find no abuse of discretion in the chancellor's imposing the attorney's fees sanction against Danny.

¶73.    We begin with the facts surrounding Danny's designation of his expert witness, Dr. Lott. Prior to trial, Daniel and Mary propounded discovery requests, including an expert witness interrogatory seeking the information set forth in Mississippi Rule of Civil Procedure 26(b)(4), namely, the expert's identity; "the subject matter on which the expert is expected to testify; the substance of the facts and opinions to which the expert is expected to testify; [and] a summary of the grounds for each opinion. . . ." M.R.C.P. 26(b)(4)(A)(ii).

¶74.    Danny responded to discovery. He did not list Dr. Lott as an expert witness in his discovery responses. On November 29, 2018—sixty-one days before the original January

31

31, 2019 trial date—Danny filed a "Designation of Expert Witness." The designation listed Dr. Lott as an expert witness and stated only that "[t]he expert is expected to testify to [the] psychological fitness of Danny R. Sims and Jonelle Sims[] for grandparent's visitation and any other opinion that the expert may acquire after hearing the testimony at trial." No other information was provided other than Dr. Lott's CV.

¶75. On January 22, 2019, Daniel and Mary moved to exclude Dr. Lott, asserting that Danny and Jonelle inadequately disclosed the substance of Dr. Lott's opinions. In that motion, Daniel and Mary also sought to recover their attorney's fees relating to their motion. On January 24, five business days before the original trial date, Danny and Jonelle served Dr. Lott's expert report.

¶76. The chancellor denied Daniel and Mary's request to exclude Dr. Lott, but granted a continuance of the trial date, as follows: "I . . . find . . . [no] basis to . . . invoke the ultimate penalty of excluding the witness without having prior duties and responsibilities to sanction . . . for the manner with which the defending parties [(Danny and Jonelle)] presented their disclosure of Dr. Lott and Dr. Lott's report. . . . Therefore, this matter shall be continued."

¶77. The chancellor also granted Daniel and Mary's request for attorney's fees associated with bringing their motion, ruling that "[Danny] shall be sanctioned with the payment of attorney fees to counsel on behalf of the movant."

¶78. Danny asserts that the attorney's fees sanction was imposed in error, contending that the chancellor was without authority to do because Daniel and Mary had not first filed a

32

motion to compel complete discovery if they believed his expert designation was insufficient. We recognize that in the general discovery context, "[w]hen a party is aware of an incomplete or evasive discovery response, that party should take affirmative action by seeking an order compelling discovery pursuant to Miss. R. Civ. P. 37(a)(2)." *Ford Motor Co. v. Tennin*, 960 So. 2d 379, 393 (¶47) (Miss. 2007) (citing *Warren v. Sandoz Pharms. Corp.*, 783 So. 2d 735, 743 (¶17) (Miss. Ct. App. 2000)).

¶79.    We find, however, that Danny's reliance on this general rule is misplaced.  Uniform Chancery Court Rule 1.10 was not at issue in *Tennin* or *Warren*, but Chancery Rule 1.10 applies in this case, providing that "[a]bsent special circumstances the court will not allow testimony at trial of an expert witness who was not designated as an expert witness to all attorneys of record at least sixty days before trial."  UCCR 1.10.  Danny asserts that he complied with Chancery Rule 1.10.  However, the specific requirement in Chancery Rule 1.10 to disclose experts "at least sixty days before trial" is in addition to the Rule 26(b) general requirements for a full expert disclosure. *See Rodrigue v. Rodrigue*, 270 So. 3d 933, 939 (¶23) (Miss. Ct. App. 2018) (noting that "a party must disclose the name and content of any expert witness that it may call to testify" under Rule 26(b) and "[i]n addition" comply with Chancery Rule 1.10).  We find that the chancellor was well within her discretion in imposing the attorney's fees sanction against Danny for his failure to fully comply with these requirements—a sanction far more lenient than exclusion of Dr. Lott altogether.  While Danny's designation of Dr. Lott sixty-one days before trial may have facially complied with

33

Chancery Rule 1.10's specific sixty-day requirement, it did not actually fulfill the general duties established in Rule 26.

¶80. Danny, however, was not without remedy. Chancery Rule 1.10 explicitly recognizes that "special circumstances" may exist warranting an exception to the sixty-day deadline. But rather than seeking an exception or requesting a continuation of the trial date so that his expert could complete his report, Danny did nothing. As we address below, in light of the chancellor's "considerable discretion in managing the pre-trial discovery process in [her] court[,]" *Hammers v. Hammers*, 890 So. 2d 944, 956 (¶47) (Miss. Ct. App. 2004), we find that Danny's lack of action in this regard is ample justification for the chancellor to impose the attorney's fees sanction against him.

¶81. In *Hammers*, the husband in a divorce action asserted that the chancellor erred in sanctioning him by excluding his expert witness for failing to timely disclose under Chancery Rule 1.10. *Id.* at 956 (¶43). Hammers designated his expert one week before trial, in violation of Chancery Rule 1.10 and the court's scheduling order, but he claimed special circumstances existed because he notified opposing counsel he was obtaining an appraisal of his business and sent a copy of the appraisal to opposing counsel as soon as it was received. *Id.* This Court rejected his argument and affirmed the chancellor's refusal to allow the expert to testify. *Id.* at (¶47).

¶82. The Court found it relevant that Hammers knew "early on" he may need an appraiser, particularly after receiving the report of his wife's expert appraiser in discovery. *Id.* at (¶45).

34

Nevertheless, "[r]ather than asking the court for an extension [to obtain his own expert] or for an amended scheduling order, [Hammers] waited almost ninety days to produce his expert information." *Id.* In affirming the chancellor's decision to exclude Hammers's expert, the Court recognized that "[t]rial judges are afforded considerable discretion in managing the pre-trial discovery process in their courts." *Id.* at (¶47). Additionally, "[t]rial judges also have a right to expect compliance with their orders, and when parties and/or attorneys fail to adhere to the provisions of these orders, they should be prepared to do so at their own peril." *Id.*

¶83. Although Danny timely identified Dr. Lott in this case under Chancery Rule 1.10, he wholly failed to fully designate Dr. Lott in a timely manner as required by Rule 26. Further, like Hammers, although he knew Dr. Lott was engaged in preparing a report, he did nothing to alert Daniel and Mary that a report would be forthcoming and attempt to work out a solution or seek a continuance to prevent the very circumstances that occurred in this case. Just as this Court recognized in *Hammers* that a trial court is entitled to enforce its own scheduling orders, *id.*, the chancellor in this case was entitled to "manag[e] the pre-trial discovery process in [her] court[,]" *id.*, and enforce the sixty-day deadline under Chancery Rule 1.10. Danny neglected to fully comply with Chancery Rule 1.10 in a timely manner, and he failed to remedy the situation in any way if he believed "special circumstances" warranted an exception to that rule. Danny did so "at [his] own peril." *Id.* Under these circumstances, we find the chancellor was well within her discretion in sanctioning him in

the form of the attorney's fees that Daniel and Mary incurred when they were forced to seek relief from the chancery court.

¶84.  **AFFIRMED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., NOT PARTICIPATING.**